ILLINOIS MUTUAL INSURANCE COMPANY, Appellant, v. THE INDUS-TRIAL COMMISSION et al. (Gerald VeVea, Appellee).

Third District (Industrial Commission Division) No. 3—89—0709WC

Opinion filed August 24, 1990.—Rehearing denied October 2, 1990.

David B. Mueller, of Cassidy & Mueller, of Peoria, for appellant.

John Lesaganich and Mark Flannery, both of Goldfine & Bowles, P.C., of Peoria, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

The employer, Illinois Mutual Insurance Company, appeals from the judgment of the circuit court confirming the decision of the Illinois Industrial Commission (hereinafter referred to as the Commission). Affirming the decision of the arbitrator, the Commission found the claimant, Gerald VeVea, permanently and totally disabled under section 8(f) of the Workers' Compensation Act (Ill. Rev. Stat. 1979, ch. 48, par.

138.1 *et seq.*) (hereafter referred to as the Act). Following a hearing concluded on July 9, 1986, the arbitrator found the claimant entitled to receive the sum of $358.95 per week for life, commencing April 23, 1983, because of accidental injuries arising out of and in the course of his employment on November 4, 1980, which had caused his complete disability and had rendered him wholly and permanently incapable of work from April 23, 1983. The arbitrator found further that claimant was intermittently temporarily totally disabled from November 4, 1980, through April 22, 1983.

The employer presents two issues for review: whether the Commission erred in finding that the claimant was permanently and totally disabled under section 8(f) of the Act and whether the Commission erred in finding that the claimant suffered accidental injuries arising out of and in the course of his employment on November 4, 1980. We consider these issues together.

At the hearing before the arbitrator, the claimant testified that on November 4, 1980, when he was 43 years old, he had been employed by the respondent for eight years and was on that date serving in the capacity of vice-president of respondent's benefits department. That afternoon he was driving alone from Peoria to Freeport in a company-owned car, assigned to him, to make a call upon an insured by the name of Russell Hyder, who claimed to be disabled but whose claim was questioned and was being investigated. The trip from Peoria to Freeport required 2 to 2½ hours. Claimant said that he had left his office at about 11:15 or 11:30 a.m. and had stopped for lunch. After he had resumed his trip, in the area of Buda, about 40 miles from Peoria, he saw an animal in the road and "put the car in the ditch to avoid hitting the animal," adding that he does not know what happened "other than I bounced around in the car." His next recollection is of someone tapping on the window of the automobile, at which time he realized that his glasses were broken and that his head was sore "around my eyes or right above the forehead, above the eyes." Although he needs his glasses to drive, he drove back to Peoria alone and arrived there, he thought, at about 3 p.m. He had gone straight to his home without returning to his office:

> "I took some aspirins. I made myself a stiff drink, I called the office. And I laid down and by that time I was really starting to feel real bad. And I made another drink thinking maybe that would help. And my son came home and he took one look at me and suggested that we go to the hospital."

During the drive back to Peoria he had noticed that his eyes were "pretty swollen shut, were almost closed, and I was awfully concerned

about the traffic." At home he noticed that one eye was "totally swollen shut, and the other eye was also puffy and swollen."

Claimant was hospitalized for about 25 days. The final diagnosis stated by his physician on November 29, 1980, upon his discharge from Proctor Community Hospital in Peoria was as follows: right temporal lobe contusion and hemorrhage, fracture of the base of left frontal bone, possible cerebral concussion, and bilateral periorbital ecchymoses. While he was in the hospital, he said, he "could not get rid of the headache," primarily in the area of his forehead.

In February of 1981 he returned to work. Upon his return he "noticed what I call thought processing, I expect there is a medical term for it, I call it thought processing, was slowed down. In order to be able to think or concentrate on something would exacerbate the headache." He worked approximately half days from February until December of 1981 during which time he noticed "[j]ust intense, just an intense headache, vomiting." At the end of December, he testified, Robert McCord, respondent's president, told him "at a meeting by the board of directors I either had the choice of resigning my position, or take some time off and come back at a reduced capacity." He chose, he said, to return at a reduced capacity.

In April of 1982 he returned to work in the capacity of a benefits manager. He noticed upon his return to work:

"Again using my term the thought processing, it just, it just wasn't there. It would take so much effort, so much concentration to do the most simple things, the routine things, the things that I would do automatically. And there was a lot of vomiting, a lot of nausea. A feeling of the left side of the body being cold."

He had, he said, "[c]onstant and severe headaches, which would get worse as the day progressed." He testified that he vomited between one and three to four times daily. Prior to vomiting "the headache would really start to get worse," he said, and he would have a feeling of nausea. Prior to November 4, 1980, he had had none of these problems.

He worked eight-hour days in the reduced capacity of benefits manager for approximately one year, until April of 1983 when he was, he said, "just totally exhausted." His job required a certain amount of travel:

"If it were, if it were rainy or if there were heavy traffic, the traffic coming at you, or the cross traffic as you wait at a stop sign or stop light or the windshield wipers would cause nausea and some type of dizziness. And, I would get lost. I would know where I would be going, and I would end up somewhere else."

Since he left the respondent's employ in April of 1983, he has had no other employment.

He testified at the hearing on October 16, 1985, that he still suffered from

"[c]onstant headache, again for an all purpose term, lack of thought processing, I go to one room, do something and by the time I get there I forget where, why I'm there. I'll make myself lunch and I'll put the milk in the bread box or put the bread in the refrigerator, it just, the thought processing is just all, it's not very good."

On cross-examination he testified that he had one bottle of beer with his lunch on the day of the incident. He had had a second drink at home, he stated, because he "thought maybe the alcohol would help numb the pain." He had had no appointment with Russell Hyder because he was making what he described on redirect examination as a "surprise call." On cross-examination he stated that he had told his immediate boss, the senior vice-president, C.S. Martin, now retired, where he was going. He described the animal he swerved to avoid as "a larger animal, like a pig or a horse or a deer or a large dog. I cannot tell you what it was. It happened rather fast." He described the day as clear and sunny and the highway as two lane. Initially he swerved to the left but then to the right. The car stopped in the ditch beside the road. He described the ditch as being as wide as the car was and his approach to the ditch as being at a 45-degree angle. He had not required assistance to get the car out of the ditch. After having determined that the car was drivable, he was able simply to back it out of the ditch and to proceed. He stated that as a result of the incident the car had sustained minor damage "to either three of or all four corners of the automobile." Also damaged, he said, were the "plastic strips between the grill and the bumper." There was a dent on the rear fender of the driver's side of the automobile. He testified that he had reported the damage to the car to respondent after he had returned to work in February of 1981. At the time of the repair, in September of 1981, the panel in back was starting to rust. He described the position of manager as one step below that of vice-president. He testified that in April of 1983 he had told Mr. Summers, the vice-president of the benefits department, that "I was unable to continue at the present time, I had to leave." He has sought no employment elsewhere since that time.

Dr. Dennis Garwacki, a board-certified neurologist who treated the claimant, testified on his behalf by evidence deposition taken on May 15, 1984. Dr. Garwacki stated that he had first seen claimant on May

5, 1981, by referral because of a chronic headache. The claimant had told him that he had had chronic headaches since the automobile accident in November of 1980 and that he was having problems

"as far as what he called getting his act together, that is, trying to get his cognitive functions proper.

He was having problems with concentrating, being able to perform activities, because he couldn't seem to put all the information together."

The witness had reviewed claimant's medical history and records prior to May 5, 1981, obtaining the following information:

"Well, probably the most important part was the CT scans, which reports I have here, which were multiple, the first one being on the day of the apparent injury, 11/5/1980, which showed basically the intracerebral hematoma on the right side.

And the subsequent CT's, one to two weeks for a series of four showing resolutions of these abnormalities on the scan itself."

Interpreting these reports, the witness stated that they showed

"an area of hemorrhage in the right side of the brain that we call the frontal area, the front part of the brain, and measured about two centimeters by two centimeters.

And along with it, there was some brain swelling or what we call edema. There is also a slight shift of the structures due to the swelling of the brain that was present."

The structures shifted from the right side to the left because of the swelling of the brain. These findings on the CT scan were, he said, consistent with the claimant's history of an automobile accident on November 4, 1980.

The witness had also reviewed prior to May 5, 1981, a report of psychological testing that "helps substantiate the fact that the patient did have some problems with some of the cognitive functions, you know, some of his tasks with memory and things." Dr. Garwacki observed, "And I thought that the psychological testing plus the CT findings and everything else would certainly—were severe enough and advanced enough to be able to give me some clue that this was an organic problem to some degree." Asked whether the results of the psychological testing showed any neurological dysfunction, Dr. Garwacki answered that they showed a tendency toward "some problems with the immediate memory," important because one of his main complaints was the inability to "organize his immediate memory to bring his thought processes to a good conclusion." Dr. Garwacki considered the claimant's memory problems to be a neurological dysfunc-

tion. Asked whether he had an opinion as to how the accident described by the claimant could result in this neurological dysfunction, the witness responded:

"Certainly showed with the findings of the CT that he certainly had enough of the injury to the brain to cause him to develop in a sense intracerebral hematoma, and also there was some bruising, contrecoup, so it showed not only a direct injury but also an injury to the opposite side to some degree, which meant that the, basically the impact would have had to be severe enough to cause distortion of the brain contents so that the opposite side was also affected."

Such distortion of the contents of the brain can be reflected, he said, in the neurological dysfunctions he had described. His diagnosis of the claimant's condition on May 5, 1981, was a "severe head injury, closed head injury, with cerebral hematoma and contusions." He noted that the claimant was both anxious and depressed "and I couldn't tell if it was primary or secondary to the head injury and to the headaches he was having, and to the fact that he couldn't function in his work."

In approximately June of 1981 Dr. Garwacki obtained a repeat CT scan, which showed "[c]ontinuing resolution" of the "primary process" and was "normal." The claimant continued to complain of headaches. In July of 1981, because of these complaints, Dr. Garwacki thought that the claimant would have difficulty "functioning adequately with the severity of the headaches, according to his subjective complaints." In September of 1981 claimant had told him that he was working but was unable to work more than half a day because of his headache problems. Asked whether there was "medical justification" for the claimant's comments about the headaches and their effect upon his ability to work more than half a day, the witness answered,

"I can only go on his complaints, and he had subjective complaints. But his complaints of headaches and the type they were and the severity, the fact that they were associated with severe nausea and vomiting, very frequently made me feel that he was having problems, preventing him from working."

Dr. Garwacki testified that it would be possible for claimant to have organic damage that is not discernible by means of the medical tests now available.

Dr. Garwacki described a continuing series of approximately monthly visits to him by the claimant in which he complained of severe headaches. Apparently in January of 1982 claimant advised Dr. Garwacki that he " 'was being forced to quit his job as vice-president because he could not perform the work on a full-time basis.' " In

March of 1982 claimant was not working, having stated that "he couldn't function so he stopped working." The witness had not made the recommendation that claimant stop working. Asked if he had an opinion as to whether there was a medical basis for claimant's feelings that he could not perform his occupational duties, the witness responded, "I can only go on his, you know, his subjective complaints, the severity of his headaches. If they were as severe as he mentioned they were, and if he did have as much nausea and vomiting as he stated that he had, then he probably would have problems functioning in his capacity." In September of 1982 claimant stated to Dr. Garwacki that he was having problems "actually working" because of the severity of the headaches, which were causing him to vomit two or three times a day. The witness testified that nausea and vomiting can follow a very severe headache.

On January 10, 1983, the witness saw the claimant again:

"Basically, at that time he had expressed the fact that he was continuing to work, although around that time, he was not doing the job he was used to doing. He was in a lesser capacity and seeming somewhat frustrated. He was angry that he couldn't really do the job that he was used to doing before, and he was getting a lot of inward pressure about work. He was at that time still having a lot of symptoms with the headaches, and he was wondering if he would be able to continue working."

In April of 1983 claimant reported to Dr. Garwacki that

"he had quit work about a week prior to seeing me. He didn't feel, however, that his headaches were any better, but he apparently felt that he could cope with them better because he could lie down, could be a little more—have more relief symptomatically. He felt the headaches were more on the right side of his head at this time, and he continued to take the medicine that I prescribed."

Concerning claimant's ability to perform his job on April 27, 1983, Dr. Garwacki stated that "if he really indeed was having as many headaches as he said he had and was uncomfortable with nausea and vomiting, then it would be very hard to function in a job with that type of complaint." He testified that he thought on May 13, 1983, the claimant could not work because of his complaints, the main ones being "severe headaches that were associated with nausea and projectile vomiting on occasion." The doctor testified that these headaches were a "continuation of the same types of headaches that he had complained about since the accident." With respect to causation the witness stated: "I can only say that his headaches have continued since the above men-

tioned injury, and that if they have continued since that time, I can only say that there seems to be a causative effect because of the time sequence." The witness suggested that claimant go to the pain treatment center of the Scripps Medical Group because "[w]e tried all types of approaches, psychological, and I had tried various medications. And I didn't think we were getting anywhere." Dr. Garwacki last saw the claimant on May 14, 1984. Concerning claimant's ability at that time to perform his job with the respondent, he stated, "Again, with his complaints, I did not feel he probably could work with those complaints."

On cross-examination the witness testified that he understood that the claimant's job was clerical when he last worked. He stated further:

"We had talked it over the time I had seen him prior to that about his ability to work, and he was basically having quite severe headaches. And he was not sure if he would be able to continue the work much longer because of the severity of his headaches. He felt he was not doing a good job. He felt somewhat frustrated. He felt like he was not the person he used to be. And with all this frustration with the severity of his headaches, he was not certain he could continue to work."

He said that whether the claimant could perform his job would be dependent upon whether he was actually having the symptoms he had expressed "because he had no neurological abnormalities that would prevent him from working. Just the severity of the headaches which is a subjective complaint, of course." Dr. Garwacki had performed 10 to 12 clinical neurological examinations of the claimant; on each examination there was an absence of any organic or pathological basis for the complaints he expressed. He had performed "many brain scans and CT scans and after the initial ones they merely showed resolution of his, you know, original hematoma or contusion." Claimant had had a headache during several visits to Dr. Garwacki's office and "looked very sick by looking at him." As to whether claimant should seek less stressful employment Dr. Garwacki testified:

"If he was having headaches with the severity he was, I would certainly have to say that he should be under less—in a situation under less stress, although, after he stopped working, he still continued. to have very severe headaches and supposedly was not under stress at that point."

Asked whether he would put any limitations upon the claimant's ability to work, based upon organic findings alone, the witness responded,

"Basically, on a physical basis, the patient had nothing to limit his work. But I do know that in past experience, that subjective complaints of headaches can be very excruciating, and they can

limit one's ability to work if they indeed are present. And, they can be present without any, really organic findings being present."

On redirect examination Dr. Garwacki testified that people do, in fact, have incapacitating headaches without the presence of any organic findings. He stated with respect to stress that "[b]asically, the picture that seemed to evolve from all the times we've talked was that whenever he would tend to be more active physically, that he would tend to have more complaints of more severe headaches." Upon recross he stated, "I still thought that a lot of his problems were psychological, but I couldn't explain why." He said further that "we see headaches as a consequence of psychological problems."

Dr. Dietra Teichmann, a psychologist employed by the Institute of Physical Medicine and Rehabilitation in Peoria, testified on claimant's behalf by evidence deposition taken on July 24, 1985. Having first seen claimant in the spring of 1981, she had been in charge of certain neuropsychological tests given to him in order "[t]o clarify the effects of the head injury in terms of his behavior." The tests that were administered were the Halstead-Reitan Neuropsychological Battery, the Wechsler Adult Intelligence Scale, the Wechsler Memory Scale, and the Minnesota Multiphasic Personality Inventory. In summary, she said, "the results showed that there was some impaired functioning." Concerning claimant's test results that demonstrated abnormal functioning of the brain, she testified:

"Specifically, there was some evidence of frontal lobe impairment in terms of poor decision making, difficulty testing hypotheses, perseverating on incorrect responses, impaired short-term memory. There was also some evidence of difficulty with proprioception, knowledge of where the body is in space which may be related to impaired functioning of the cerebellum. Short-term memory, in addition to being related to impairment of the frontal lobe, can also be related to temporal lobe impairment, or hippocampal impairment or some of the subcortical structures."

Concerning the claimant's short-term memory problems shown by the tests, the witness said that he was one standard deviation below the average for a person of his age in terms of being able to remember relevant information from a paragraph. Another specific example of abnormality was displayed by the claimant in the categories test:

"[This] is a problem-solving test in which a slide was shown to Jerry, he was to respond to it in a manner to test a certain hypothesis, and if he was correct, then he would assume that he might work on the next slide. If he was incorrect, he'd have to

remember what the hypothesis was, throw it out and try something different on succeeding slides.

Jerry was—had extreme difficulty even recalling what the previous slide was much less what hypothesis he had already tested out."

The witness had never recommended that plaintiff not work or not return to his job as a vice-president.

She described the claimant as he appeared the week before the taking of her deposition:

"Not really much change from what I've been seeing all along. Difficulty expressing himself, trouble groping for words, decision-making problems, memory problems, not quite as depressed as when I had seen him earlier in the spring, at which point I was really concerned about the possibility of suicide."

Abnormalities she observed at that time included decision-making problems, short-term memory problems, perseveration, impulsivity, and poor frustration tolerance. Asked whether these conditions could have been related to the accident described by him as having occurred in November of 1980, she responded, "To the best of my knowledge, that's when it all started." She gave as a diagnosis "[c]losed head injury." She indicated that head-injured persons have a typical behavior pattern that includes, for example, short-term memory problems, planning problems, difficulty dealing with abstract and complex concepts, verbal expression difficulties, verbal receptive difficulties, and difficulty understanding complex grammatical structures. The claimant, she said, exhibited all of these problems. Asked whether he could perform the duties of a vice-president of an insurance company, she answered, "I don't think he could do it," adding, "I would assume that an executive would have to be able to make decisions, and Jerry is not capable of doing that right now." Another reason she gave for his inability so to perform was his memory problem: "If Jerry doesn't have it written down on a piece of paper that he can refer to readily, he's not going to remember it, whatever it might happen to be." She expressed her view that "[o]verall, [claimant's condition] appears to be getting worse" and described his prognosis as "[v]ery poor at this point." She expressed her doubt that, even if claimant were to participate in certain pain management or cognitive retraining programs, he would ever be able to return to his work as an insurance executive: "I think he could return to something, but I doubt that he would ever be employable at that level again, and that's being optimistic." She stated her opinion that claimant was not employable in the field of insurance claims or as vice-president of an insurance company, adding:

"During the first few months of treatment when he was under the care of Dr. Mermis, there was some hope that he would be able to return [to the job he was performing prior to his accident] and, in fact, he was encouraged to try to return to work. Following that trial—During the time that I have been actively involved with Jerry, since that time, no, I do not think he was ever able to go back."

On cross-examination this witness testified that when claimant was retested in February or March of 1983 he improved "[i]n some ways" but "in many respects he did not." She stated that she had been aware that he had returned to work but had been unaware that he had, in the words of counsel, "performed to the satisfaction of his employer." Her understanding of the reason claimant terminated his employment was "that it was a combination of pain complaints and the impaired memory." Asked, "And therefore were you aware that any evidence of organic brain damage that was demonstrable on either CT scan or EEG had cleared within one year of the original injury?" she answered, "Sure, but that's a very typical picture."

On redirect examination she described the limitations of some medical tests, such as the CT scan and electroencephalogram:

"The [CT] Scan specifically can only register gross changes in the brain. It cannot register micro changes that happen at the cellular level, or at the, whatever the next higher level is called. In a closed head injury, the way the brain is situated, it's encased in a fluid inside the skull. And in Mr. Vevea's [sic] case, he was moving forward. Something caused him to stop. The brain would rattle around causing a coup and a contrecoup, and that's where you might be getting things like the frontal lobe injury and the cerebral injury. In addition though, a lot of shearing takes place in the brain, so it's not just the two areas that are impaired. It affects the subcortical structures. It affects not just the two areas of impact, but it can affect—it can affect other parts of the brain. And in a closed head injury, the typical pattern is that we see this more diffused kind of pattern."

The witness testified that there can be abnormalities in the brain that a CT scan or an electroencephalogram are unable to detect.

Dr. Bernie Mermis, another psychologist at the Institute of Physical Medicine and Rehabilitation, testified on behalf of the claimant by evidence deposition taken on October 5, 1984. This witness was in overall charge of claimant's care and treatment at the institute. Dr. Teichmann, he said, was the supervisor in the area of neuropsychological testing. The witness had first seen claimant in the spring of 1981

upon referral, the purpose of which was to aid in a diagnosis. Claimant had two areas of difficulty: a headache since the accident in November of 1980 and problems related to "functioning cognitively and intellectually." The witness defined "functioning cognitively" as "[b]eing able to think, being able to problem solve, being able to remember readily various events that occurred." The witness testified that, although claimant's "impairment index was below the cutoff to indicate brain damage, other bits of evidence of his performance indicated that he, in fact, was experiencing some impairment in brain function." The witness drew this conclusion because of the pattern of his complaints and the level of his "premorbid" functioning. Claimant's functioning on the testing was inconsistent with what one would expect in light of his level of premorbid functioning, as indicated by his prior performance in school and in the workplace. Addressing some of these inconsistencies more specifically, the witness stated that on the portion of the Halstead-Reitan called the category test, which is a concept formation test and involves "a lot of very complicated thinking processes," he showed "a great deal of difficulty," unexpected from someone "as, assumed to be as bright as Mr. Vevea [sic], as capable cognitively, intellectually, as Mr. Vevea [sic]. That was one of the surprising areas of deficit." The witness considered the testing to include both objective and subjective components.

The witness' diagnosis of claimant's condition was organic brain syndrome subsequent to closed head injury. Dr. Mermis' judgment was that the condition was associated with the accident of November 4, 1980. With respect to the course of treatment initially planned for claimant, the witness testified that claimant had been "very much interested in" returning to work and that they had suggested he do so and see if he "was able to function," using extensive note taking and tape recording to compensate for his difficulties with memory. Concerning the requirements of claimant's job, the witness stated that claimant had reported "great difficulty in even carrying out the duties that he had done very readily in the past." With reference to the effect of a condition like the claimant's upon a person functioning at a high intellectual level, as opposed to one functioning at a lower intellectual level, Dr. Mermis explained,

> "With brain injury, I think one sees the most dramatic impairments with people who have been very high in their level of functioning prior to injury. As an example, someone who is of average intellectual cognitive skills and is carrying out fairly routine kinds of job activities, after a minor brain injury can very often go back to that kind of a job and carry it out success-

fully because it really wasn't requiring all that much of the individual to do the job in the first place. There's enough left to be able to do the job.

When one deals with a highly technical job, one that requires a great deal of and facility in cognitive functioning, even minor impairments can be devastating. An example of that would be somebody in a job like my own where I need to be constantly attending to various cues, recollect a great deal of information about what's being presented to me to be able to synthesize that into some conclusion. When you have a brain injury of some sort, even minor, those are the functions that get hit, that are impaired.

So I think that the individuals that we see here who have been very high level functioning individuals premorbidly are the ones who are both personally and functionally most devastated by the brain injury."

Dr. Mermis saw the claimant about 60 times, seeing him for the last time in December of 1983. His final diagnosis was unchanged, that is, that claimant suffered from the sequelae of a closed head injury, from an organic brain syndrome, and from a chronic, continuous post-traumatic headache. He was of the opinion that the claimant's condition was related to the accident and that he could not perform the duties of his job. He based this opinion "[b]asically, upon the self report of Mr. Vevea [sic] as to the difficulties he was having with the job and the impact that he was experiencing from trying to function on the job."

Concerning claimant's prognosis the witness testified, "I don't think there's any way to predict with certainty what's going to happen with Jerry." He explained that most of the improvement that is going to occur in brain-injured persons such as claimant will take place within the first 6 to 12 months after injury. Progress for such a patient after the first year is very slow and very small. Therefore, he concluded that claimant "will not make remarkable changes from where he is right now." He stated that the claimant's memory function had improved slightly over the 2½ years in which he saw him and that some of his cognitive functioning had improved slightly, but his "pain problem" remained unchanged and, in fact, had deteriorated. The witness testified that, with respect to claimant's discontinuing work, he had recommended to him "[t]hat he discontinue his position to see whether it would be helpful for him in terms of both the headache and in terms of working more specifically on some of the cognitive intellectual deficits that he was experiencing." He said that "[s]everal of the physicians seeing him and I suggested numerous times that he con-

sider withdrawing from the job for a period of time to see if that would produce any improvement" and that claimant had done so for a time "with no improvement." He described claimant as having continued "to push himself to be on the job."

On cross-examination Dr. Mermis testified that the category test had been given to claimant originally on April 24, 1981, and had been repeated by Dr. Teichmann in March of 1983; upon retesting, the score was still within the impaired range. "The change that did occur," he said, "according to Dr. Teichmann, was that Mr. Vevea [sic] was much less agitated on this occasion, calmer in dealing with the test materials than he had been on the first occasion." On the first administration of the category test claimant made 60 errors; on the second he made 58 errors, "a very slight change," according to Dr. Mermis, who testified that "[t]he impairment cut I believe occurs at approximately 50 errors." Dr. Mermis stated that most of the results of claimant's intelligence test were in the "superior" range but there were "some exceptions." The "total summaries" of the portions of the tests were all within the superior range, but there were subscales of tests that were not within that range. The result of the Wechsler Memory Scale fell within the "average" range.

Dr. Mermis testified further that, if a person has abnormal neuropsychological test results, one would not expect to have abnormal results from "objective" tests such as brain imaging, CT scan, and neuroencephalogram because such techniques depend upon structural findings. Although damage from bleeding and from a tumor, for example, shows up very readily with the use of such techniques, damage as a result of toxic conditions, for example, does not. "Closed head injury problems rarely show up on the testing techniques *** described," he said, because such injury appears to cause multiple small injuries undetectable by these techniques.

Dr. Mermis stated that the claimant had become impaired, with respect to functioning in his job, "in having quick access" through his memory to information necessary for making decisions. Further, Dr. Mermis said,

"[h]is memory difficulties were quite significant in that he had to resort to extensive note taking and tape recording of phone conversations in order to be able to recall that he had spoken to a client.

He reported that he would at times have a phone conversation, and five minutes later would be unable to recall any components of that phone conversation."

The claimant had two areas of difficulty: "Memory and also the prob-

lem solving component of the job. That is, being able to put bits of information together to form conclusions about specific questions." The claimant has, he said, problems with both "retrieval" and "storage": "He tended to have a great deal of difficulty incorporating new information, so he was unable to build new information into his system that would help him out. To put it in simpler terms, he wasn't learning the material very well at all when he tried to." Dr. Mermis expressed the view that the claimant was able to function cognitively "at some level, but it's my opinion that he's not able to function the way he did before the injury." Asked whether claimant would be suited to employment of a routine, repetitive nature requiring little application of the cognitive functions, the witness answered, "I think he would be able to handle that from the perspective of cognitive intellectual demands. What would impair him would be the headache ***." He described the headache as "a significant impediment to his job performance at Illinois Mutual" and something that "would present a problem in almost any kind of employment for him." Dr. Mermis testified that there was "no way" of knowing whether the claimant actually suffered from the complaints he described.

Admitted as one of claimant's exhibits is a Vocational Information Systems Evaluation Report, dated July 31, 1985, and prepared for the employer. The evaluator of this report about claimant was Thomas Frederick, who stated that the report was a continuation of an assessment made by him on August 22, 1984, at the request of respondent's counsel. Mr. Frederick stated further:

> "The first report concluded that, based on his work history, he has many skills which would easily make him employable, but considering his reactions to simple stresses, the headaches, the memory problems, and the psychological implications, he was seen as unemployable."

Counsel for the employer had requested, Mr. Frederick said, "a second job title search to determine what jobs would be available to Mr. Vevea [*sic*] assuming the considerations mentioned above are not present or have been overcome."

Dr. Alex J. Arieff, board certified in the specialties of both neurology and psychiatry, testified on behalf of the employer by evidence deposition taken on October 3, 1985. This witness had examined claimant on October 3, 1983, at the request of the employer. He stated that he had not found a reason for claimant's headache either "organically or objectively." Asked whether he had found any organic or objective basis for his complaints concerning a lack of concentration, the witness answered, "Not on my examination except for his mood disturbance,

which can produce symptoms of lack of concentration." He testified that he had found no basis "in an objective or organic sense" of his complaints of memory loss. He said further that "[i]n a purely objective sense" he had found no residuals of a closed head injury, with the exception of things like arm swinging that Dr. Arieff thought were voluntary on claimant's part. This witness had recommended that claimant have a "good psychological evaluation," apparently by Dr. Jack Arbit, with whom the witness "usually work[s]." The witness concluded that claimant needed psychiatric therapy.

On cross-examination Dr. Arieff testified that organic brain damage "may" affect the brain's powers in the role of regulating chemicals which, when imbalanced, can cause depression. He expressed the view that claimant's symptoms were due to a depression for which he was not receiving "proper treatment." He stated that claimant had suffered organic brain damage "originally after the injury; but people do recover." Difficulty in concentration is, he admitted, a "[p]ossible" symptom of organic brain damage, but usually a person with organic memory deficit is not aware of it and rarely complains about it. "It may be," he said, "but it's rare."

Testifying on behalf of the employer by evidence deposition taken on October 3, 1985, was Dr. Jack Arbit, a psychologist, who had examined and tested claimant on June 12, 1985, at the employer's request. He had administered to claimant the Wechsler Adult Intelligence Scale, the Wechsler Memory Scale Form I, the Bender Visual Motor Gestalt Designs test, the Memory for Designs test, and the Halstead-Wepman Aphasia Screening test. He testified that the findings with respect to the test results did not appear to be consistent with a diagnosis of an organic brain disturbance. The claimant's scores on the Wechsler Adult Intelligence Scale were in the "bright normal" range. Concerning the results of this test, the witness stated further:

"While [claimant] had difficulty with some of the organic sensitive tasks and while this score seemed to be reduced from what had been obtained at prior evaluations, the particular discrepancies noted were not of a pattern that would consistently bespeak a meaningful organic brain disturbance, in that while he obtained lower scores on immediate memory and one of the visual motor tasks, he obtained his highest scores on other tests that are equally sensitive to the presence of an organic brain disturbance."

In his opinion, if an organic brain disturbance were, in fact, present, there would have been a "correlation or consistency." The witness stated that, "[i]n terms of the associate learning subtest of the Mem-

ory Scale, the pattern of results also seems inconsistent in terms of an organic brain disturbance, since he does not perform in the way one generally finds and comes to expect of people with an organic brain involvement." He observed that claimant "performs slowly, and to some extent his difficulties seem related to that," adding:

> "Based upon the slowness and this inconsistent function on the associate learning subtest, it was my opinion that the seeming reduction in the memory quotient was not related to an organic problem but to a conscious control of his functions with this instrument."

By "conscious control," he said, he meant "volitional" control by the claimant.

Dr. Arbit testified that the Rorschach Psychodiagnostic test, that is, the "inkblot" test, was also administered, the results of which provided "a reasonable and viable alternative explanation for the symptoms and complaints reported by Mr. VeVea." This alternative explanation, as opposed to one based upon organic brain dysfunction, was "functional," he said, "meaning that there is a conscious component to the focus upon the somatic complaints that he subjectively reports." The results of the Minnesota Multiphasic Personality Inventory, also administered, "were a very marked preoccupation with endorsing items that would indicate a most notable agitated depression and fixation upon a rather extensive array of unrelated and inconsistent complaints as to body functions." Although the witness could give no examples of the complaints about body functions to which he referred, he testified,

> "But clearly, in order to get the scores as high as he does on the scales of hypochondriasis and hysteria, he must endorse an inordinate number of items as to bodily ailments, complaints, disturbances, distress that seem to involve an awesome host of physical systems, none of which seem particularly related to each other or consistently present, and none likely to be a manifestation—I'm sorry, and few a manifestation of the kind of injury which he purported to have."

The terms "hypochondriasis" and "hysteria" he said "[i]n the current instance, *** refer to a fixation and preoccupation with somatic complaints that would seem to bespeak the presence of some need to enhance, to overelaborate, to become obsessed and preoccupied with his physical functioning to an extent greater than would seem objectively reasonable." He indicated that these test results with respect to hypochondriasis and hysteria support the opinion that from a psychological perspective there is not consistent evidence of organic brain dysfunc-

tion because "they show a man who takes great pains and care to elaborate symptoms and complaints that simply don't fit together in a meaningful fashion."

On cross-examination Dr. Arbit testified that claimant's test results showed some overall reduction and some specific difficulty with some of the more organic sensitive material which would "[n]ot necessarily" but "could be" evidence of some organic problem in the brain. He testified further that, assuming that prior intellectual test scores were in the superior range, his own finding indicated a lessening of abilities; he stated that these types of test scores would decrease if a person suffered from organic brain disturbance "[a]mong other things." Assuming such a decline in an individual's intellectual test scores, the witness stated that "[a]s a hypothetical instance," it is "always a possibility" that such a decline would indicate a problem affecting that individual's learning capability. However, a person's intellectual test scores can decline in the absence of a problem affecting his learning capability "[w]hen the person is either malingering or consciously distorting so that his performance does not reveal the maximum that he is capable or she is capable of doing." The witness stated that, based upon his review of the claimant's records and examinations, he could not rule out the presence of some residual organic brain disturbance.

On redirect examination he testified that the significance he ascribed to claimant's difficulty with "some organic brain sensitive material" was "[t]hat it was the result of his efforts to enhance the degree of difficulties he was experiencing." He stated that, if there were, in fact, "evidences" of mild organic brain disturbance, they could not account for the extensive array of complaints manifested by claimant on the Minnesota Multiphasic Personality Inventory and during the conduct of the witness' examination of him.

The employer called as a witness Lloyd Reed, who is the respondent's senior vice-president, responsible for, among other things, company property, including the acquisition, sale, and use of automobiles. He stated that he and a subordinate, Charles Kellogg, had inspected the automobile issued to claimant for physical damage shortly after claimant's return to work in about February of 1981. He testified that upon his inspection he had observed no damage "whatsoever" of any kind to either the exterior or the interior of the vehicle. On cross-examination he testified that this automobile was repaired on September 15, 1981. The witness indicated that he had no knowledge of any damage to this vehicle reported as having occurred after the time of his inspection of it. Although the invoice for these repairs was admitted

into evidence as claimant's exhibit No. 25, it does not appear to be included in the record for review. Testifying about this exhibit, the witness indicated that the repairs that were made to the vehicle on that date by Ron's Autobody, which regularly serviced the respondent's vehicles, included repairs to the left door, a taillight, and a park lamp assembly, which is, he said, "part of the corner of the vehicle." Other repairs made to the vehicle on that date about which the witness testified include aligning and touching up the front bumper fillers, painting the right front fender, and "STR left quarter," which he stated meant probably to "straighten corner." The cost of the repairs paid by the respondent was, he said, $350. He testified that he had no information concerning the vehicle's having been involved in any other incident or accident.

Also testifying on behalf of the respondent was Charles Kellogg, Jr., respondent's manager of the home office services department in charge of transportation and communications. He stated that in 1980 and 1981 claimant had had a company car issued to him. This witness said that on February 1, 1981, he had had occasion to inspect claimant's company car with "Bill Reed." He testified that at that time he found no interior or exterior damage, including any of the four corners of the car and the fenders or quarter panels. He testified further that when he examined the automobile in February of 1981 none of the "matters" shown on claimant's exhibit No. 25, which is the invoice for repairs made by Ron's Autobody, were present on the car. He described Ron's Autobody as "our autobody specialist. Up where we have all our work done on all of our company cars."

On cross-examination he testified that it is "possible" that he could have overlooked the dent requiring straightening of the quarter panel. He stated that he did not work on Saturdays or Sundays. He said that he knew of no indication in the respondent's file that the car was involved in any accident or incident after February of 1981 and before the September date of the invoice.

The arbitrator noted in his highly detailed decision that the Commission was taking judicial notice that February 1, 1981, was a Sunday, when Mr. Kellogg would not, according to his testimony, have been working. The arbitrator found that such testimony undermined this witness' credibility.

Upon review the Commission made the following findings of fact:

> "1. [Claimant's] testimony as to the accident is unrebutted and is corroborated by histories given to Respondent's claims examiner and to treating medical providers, and is found by the Commission to be credible. The Commission therefore finds that

while travelling on November 4, 1980[,] to investigate a claim, [claimant] drove into a ditch to avoid hitting an animal in the roadway, and struck his head, sustaining a fracture of the frontal bone, contusions to the head and eye area with intracerebral hematoma.

2. The Commission relies on [claimant's] testimony and that of his treating physicians, Drs. Garwacki, Teichmann and Mermis[,] in finding that as a result of the accident [claimant] suffers from headaches, impaired memory and ability to concentrate, such that he is unemployable. Respondent's vocational evaluation of [claimant] by Thomas Frederick confirms that given the presence of these conditions [claimant] is unemployable."

 █ It is the function of the Commission to resolve disputed questions of fact, including those of causal connection, to decide which of conflicting medical views is to be accepted, and to draw permissible inferences. (*Material Service Corp. v. Industrial Comm'n* (1983), 97 Ill. 2d 382, 454 N.E.2d 655.) In the presence of conflicting medical opinion, the Commission's determination is given substantial deference and will be upheld unless it is contrary to the manifest weight of the evidence. (*Material Service Corp.*, 97 Ill. 2d 382, 454 N.E.2d 655.) The Commission is the judge of the credibility of witnesses. (*Caterpillar Tractor Co. v. Industrial Comm'n* (1983), 97 Ill. 2d 35, 454 N.E.2d 252.) It is the peculiar province of the Commission not only to determine the credibility of witnesses but also to weigh the testimony and to determine the weight to be given to the evidence. (*Berry v. Industrial Comm'n* (1984), 99 Ill. 2d 401, 459 N.E.2d 963; *Dunker v. Industrial Comm'n* (1984), 126 Ill. App. 3d 349, 466 N.E.2d 1255.) A reviewing court should neither overturn the Commission's findings simply because a different inference could be drawn nor otherwise substitute its judgment for that of the Commission. *Hoegger v. Industrial Comm'n* (1987), 158 Ill. App. 3d 1025, 512 N.E.2d 10.

 An employee is totally and permanently disabled when he is unable to make some contribution sufficient to justify payment of wages. (*Continental Drilling Co. v. Industrial Comm'n* (1987), 155 Ill. App. 3d 1031, 508 N.E.2d 1246.) For purposes of section 8(f) of the Act, a person is totally disabled when he cannot perform any services except those for which no reasonably stable labor market exists; conversely, if an employee is qualified for and capable of obtaining gainful employment without seriously endangering health or life, such employee is not totally and permanently disabled. (*E.R. Moore Co. v. Industrial Comm'n* (1978), 71 Ill. 2d 353, 376 N.E.2d 206.) A claimant

has the burden to prove that no employment is available for a person with his disability unless he is obviously unemployable or unless there is medical evidence to support a claim of total disability; if the employee can establish that although he is not altogether incapacitated for work, he is so handicapped that he cannot be employed regularly in a well-known branch of the labor market, the burden shifts to the employer to show that some kind of suitable work is regularly and continuously available to the employee. (*Reynolds v. Industrial Comm'n* (1986), 151 Ill. App. 3d 695, 502 N.E.2d 1178.) Causation and the permanency and degree of disability are issues of fact for the Commission, and its award will be set aside only if it is against the manifest weight of the evidence. *Continental Drilling Co.*, 155 Ill. App. 3d 1031, 508 N.E.2d 1246.

■ In the instant case the Commission expressly found the claimant's testimony to be credible. As a consequence, it found that the unwitnessed accident occurred under the circumstances described by the claimant. In consequence of its finding that claimant's testimony was credible and of its reliance upon the testimony of his treating doctors, Drs. Garwacki, Teichmann, and Mermis, the Commission found that he did, in fact, suffer from headaches and impaired memory and ability to concentrate so that he is unemployable. Although the medical opinions were conflicting, there was abundant evidence in the testimony of these three witnesses in particular and the record as a whole to support these findings of the Commission. It was not against the manifest weight of the evidence for the Commission to find that claimant was permanently and totally disabled under section 8(f) of the Act and that claimant suffered accidental injuries arising out of and in the course of his employment on November 4, 1980.

The claimant's motion to strike the employer's statement of facts, taken with the case, is hereby denied, and the judgment of the circuit court confirming the decision of the Commission is affirmed.

Affirmed.

BARRY, P.J., and McNAMARA, WOODWARD, and McCULLOUGH, JJ., concur.