MODERN DROP FORGE CORPORATION, Plaintiff-Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Roger Koenig, Appellee).

First District (Industrial Commission Division)  No. 1—95—2336WC

Opinion filed August 16, 1996.—Rehearing denied October 23, 1996.

COLWELL, J., dissenting in part, joined by RARICK, J.

Nyhan, Pfister, Bambrick & Kinzie, P.C., of Chicago (Miles P. Cahill and Micaela M. Cassidy, of counsel), for appellant.

Cronin & Peters, of Chicago (Patricia C. Cook, of counsel), for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

Respondent employer Modern Drop Forge appeals the judgment of the circuit court of Cook County confirming the Industrial Commission's decision awarding benefits to the claimant, Robert Koenig. The respondent contends that (1) the Commission erred in awarding benefits at the rate of $66^2/3$ % of average weekly wage for a statutory amputation, rather than at the 60% rate; (2) the award of penalties and attorney fees was against the manifest weight of the evidence; and (3) the Commission's finding that the claimant's carpal tunnel syndrome in his left hand is causally related to the accident in which his right hand was severed is against the manifest weight of the evidence. We affirm in part and reverse in part the judgment of the circuit court, and confirm the Commission decision as modified.

The claimant was injured on December 15, 1988, at Modern Drop Forge's Blue Island plant when a 1,500-pound "drop hammer" crushed his right forearm and broke his left middle finger at the base of the proximal phalanx. His right arm was subsequently amputated approximately 8 to 10 centimeters below the bend of the elbow. Prior to the accident, Koenig was right-handed. The claimant's initial treating physician, Dr. Neal Zimmerman, offered the claimant surgical and nonsurgical options for repair of the injured finger. Even though the nonsurgical option might result in less than anatomic correction of the fracture, claimant refused surgery on the left hand.

The claimant was fitted with a prosthetic device and attended physical therapy for both the right arm and left hand. He returned to work on June 12, 1989. Upon his return to work, the claimant was no longer physically able to perform his previous job, which had paid $9.25 per hour for a 40-hour week. Instead, he went to work in the respondent's code inspection shop, where he was paid $6 to $6.50 per hour and worked only 22 to 26 hours per week. This position required the claimant to lift steel machine parts, place them on a table, measure them with a micrometer and then replace them in a bin. The claimant attempted to perform this job using only his remaining left hand and was not given any vocational rehabilitation.

The claimant testified that soon after he returned to work, he began to notice numbness and tingling in his left hand. Prior to his accident, the claimant had never experienced any problem with his

left hand. He also said that he was slower than the other inspectors in performing his job.

On August 18, 1989, the claimant resigned from Modern Drop Forge. He testified that he was having trouble using the prosthetic device, he was having numbness and tingling in his left hand, he could not keep up with his work, and he was "really depressed." He moved to Buffalo, New York, to be near his family. He attended some vocational rehabilitation in New York, attempted to return to school (but had difficulty learning to write left-handed) and received services from the New York State Department of Education for Individuals with Disabilities. He was not employed at the time of the hearing before the arbitrator.

From the time of the accident through March 16, 1992, the respondent had paid the claimant $6,173.76 in temporary total disability (TTD) benefits, and had "loaned" him $1,000 against his statutory compensation entitlement for the loss of his right arm. This "loan" was made on August 4, 1989, after the claimant informed the respondent that he was having trouble paying his bills. On March 12, 1992, the claimant filed a petition for penalties and attorney fees regarding the delay in payment of the permanent partial disability (PPD) benefits for the amputation of an arm. On March 18, 1992, the respondent paid the amount of PPD benefits that had accrued to that point ($39,559.48), and thereafter made regular periodic payments.

Dr. Andrew C. Matteliano became the claimant's treating physician in Buffalo and, in January 1991, diagnosed the claimant as suffering from left carpal tunnel syndrome resulting from overuse following the amputation of the dominant right hand. An electromyography (EMG) and nerve conduction velocity test performed on March 6, 1992, were compatible for left carpal tunnel syndrome. Matteliano believed the carpal tunnel syndrome was related to the loss of the dominant arm. He acknowledged that the claimant suffered a fall in December 1990, for which claimant did not give a history of striking the left hand.

At the request of the employer, the claimant was examined on March 16, 1992, by Dr. Janet Elliot. She found no indication of carpal tunnel syndrome. She opined that the claimant suffered from tendonitis. She testified that she got the impression from the claimant that his left hand symptoms were "intermittent" and that he had returned to school and was using his left hand for writing. In her report to the respondent, she acknowledged that the EMG performed at Matteliano's request did show mild evidence of carpal tunnel syndrome. It was her opinion that claimant's left hand symptoms were not caused by the work he performed for respondent in 1989

following the amputation of the right arm. She explained that tendonitis could come and go.

Following hearings on June 15 and November 13, 1992, the arbitrator awarded the claimant $246.95 per week for $25^3/7$ weeks for TTD (820 ILCS 305/8(b) (West 1992)) and $222.25 per week for $272^1/4$ weeks for PPD. The PPD was awarded for loss of 15% use of the left hand, 25% loss of use of the left middle finger, and 100% loss of use of the right arm. 820 ILCS 305/8(e)(9), (e)(3), (e)(10) (West 1992). The arbitrator specifically found that the respondent's delay in paying benefits was unreasonable and vexatious, but said he believed he was without authority to award penalties, as only the Commission is specifically authorized to do so. The arbitrator directed the claimant to present his claims for penalties and fees to the Commission.

The Commission modified the arbitrator's award in the following respects by awarding (1) PPD for 100% loss of an arm at the rate of $246.95 ($66^2/3$% of claimant's average weekly wage) for 235 weeks; (2) PPD at $222.25 per week (60% of the average weekly wage) for a total of 37.25 weeks for loss of use of the left hand (28.5 weeks) and left middle finger (8.75 weeks); and (3) $18,874.39 in penalties pursuant to section 19(k) of the Workers' Compensation Act (Act) (820 ILCS 305/19(k) (West 1992)) and $3,774.88 in attorney fees pursuant to section 16a(B) of the Act (820 ILCS 305/16a(B) (West 1992)). The circuit court confirmed the Commission's decision.

The respondent first contends that the Commission erred in awarding the claimant benefits for the loss of his arm at the rate of $66^2/3$% rather than at 60%. In making the award, the Commission cited section 8(b)(4) of the Act, which reads in pertinent part:

"All weekly compensation rates provided under subparagraphs 1, 2 and 2.1 of this paragraph (b) of this Section shall be subject to the following limitations:

\* \* \*

From July 1, 1977 and thereafter such maximum weekly compensation rate \*\*\* for amputation of a member or enucleation of an eye under paragraph (e) of this Section shall be increased to $133^1/3$ % of the State's average weekly wage in covered industries under the Unemployment Insurance Act." 820 ILCS 305/8(b)(4) (West 1992).

The respondent argues that the plain language of section 8(b)(2.1) of the Act limits compensation for a statutory amputation to 60%. Section 8(b)(2.1) reads in pertinent part:

"The compensation rate in all cases \*\*\* under paragraph (e) of this Section shall be equal to 60% of the employee's average weekly wage \*\*\*." 820 ILCS 305/8(b)(2.1) (West 1992).

Section 8(e) of the Act is the statutory enumeration of specific compensation due for total loss of particular body parts. 820 ILCS 305/8(e) (West 1992). Section 8(e)(10) of the Act sets the statutory compensation rate for loss of an arm at 235 weeks. 820 ILCS 305/8(e)(10) (West 1992).

The primary goal of statutory interpretation is to ascertain and give effect to the intent of the legislature, which is best evidenced by the clear and unambiguous language of the statute. *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189, 561 N.E.2d 656, 661 (1990). All portions of the Act must be read as a whole and in such a manner as to give them the practical and liberal interpretation intended by the legislature. *Vaught v. Industrial Comm'n*, 52 Ill. 2d 158, 165, 287 N.E.2d 701, 705 (1972). The purpose of the Act is to provide employees with a prompt, sure remedy for their injuries and to require that the cost of industrial accidents be borne by the industry rather than by its individual members. *Lester v. Industrial Comm'n*, 256 Ill. App. 3d 520, 523, 628 N.E.2d 191, 193 (1993).

Sections 8(b)(2), 8(b)(2.1) and 8(b)(4) of the Act (820 ILCS 305/8(b)(2), 8(b)(2.1), 8(b)(4) (West 1992)) concern the method of determining benefits. Section 8(b)(2) of the Act provides "[t]he compensation rate in all cases" (820 ILCS 305/8(b)(2) (West 1992)) shall be $66^2/3\%$ of the average weekly wage other than for (1) TTD; (2) serious and permanent disfigurement to the arm under section 8(c) of the Act (820 ILCS 305/8(c) (West 1992)); (3) PPD under section 8(d)(2) of the Act (820 ILCS 305/8(d)(2) (West 1992)); and (4) recovery under section 8(e). Other than as to TTD, section 8(b)(2.1) provides the compensation rate for the exceptions set out in section 8(b)(2). Section 8(b)(2.1) provides that "60% of the employee's average weekly wage" shall be "[t]he compensation rate in all cases of" (1) serious and permanent disfigurement under section 8(c); (2) PPD under section 8(d)(2); and (3) recovery under section 8(e). 820 ILCS 305/8(b)(2.1) (West 1992).

The arbitrator awarded benefits using the 60% rate, 100% (235 weeks) for loss of use of the right arm, 15% ($28^1/2$ weeks) for loss of use of left hand and 25% ($8^3/4$ weeks) for loss of use of the left middle finger. The Commission referred to section 8(b)(4) of the Act, and with no other explanation awarded the $66^2/3\%$ rate for the loss of use of the right arm. The Commission affirmed the arbitrator's 60% award for loss of use of the left hand and left middle finger. The circuit court confirmed, also referring only to section 8(b)(4), saying the "maximum rate available" to claimant "is $66^2/3\%$ of his average weekly wage."

■ Section 8(b)(4) of the Act sets maximum limits. That section states, "All weekly compensation rates provided under subparagraphs

1, 2 and 2.1 of this paragraph (b) of this Section shall be subject to the following limitations." 820 ILCS 305/8(b)(4) (West 1992).

Section 8(b)(4) of the Act, in limiting recovery, provides that the maximum recovery under paragraphs 1, 2, and 2.1, after July 1, 1977, for amputation of a member shall be increased to $133^1/3\%$ of the State's average weekly wage. The term "increased to" in the last paragraph of section 8(b)(4) (820 ILCS 305/8(b)(4) (West 1992)) is in relation to the limitation of 100% of the State's average weekly wage which was set forth in the second paragraph of section 8(b)(4) and which existed prior to July 1, 1977. See Ill. Rev. Stat. 1975, ch. 48, par. 138.8(b)(4).

The portion of section 8(b)(4) of the Act referred to by the Commission would be applicable only if the recovery awarded under sections 8(b)(1) (820 ILCS 305/8(b)(1) (West 1992)), (b)(2), and (b)(2.1) of the Act exceeded $133^1/3\%$ of the State's average weekly wage. No argument is made by either party that the recovery exceeded the limit of section 8(b)(4).

Once again, as stated in the first paragraph of section 8(b)(4) of the Act, its purpose is to limit recoveries. See *Bohannon v. Industrial Comm'n*, 237 Ill. App. 3d 989, 993-94, 606 N.E.2d 527, 529-30 (1992). Under the facts of this case, it is clear section 8(b)(2.1) applies and the proper rate of compensation for the three PPD awards made by the Commission was 60% of the claimant's average weekly wage. For this reason, we modify the Commission's decision to award claimant $222.25 per week for 235 weeks for 100% loss of the use of his right arm.

■ The respondent's next contention is that the Commission erred in awarding penalties to the claimant pursuant to section 19(k) of the Act and attorney fees pursuant to section 16a(B) of the Act. 820 ILCS 305/19(k), 16a(B) (West 1992). In awarding penalties, the Commission relied on *Lester*. The *Lester* court applied the principles of statutory construction to section 8(e) of the Act and said:

"[W]e find that the legislature intended that individuals who receive amputations should be immediately compensated when no dispute exists as to whether the injury arose out of and in the course of employment. Such a result is consistent with the legislature's intent because prompt payment alleviates the possibility that an employee will be faced with unnecessary financial burdens. Requiring immediate payment is not unfair to the employer because statutorily it would have to pay the amount owed at some point in time. It is consistent with the purpose of the Act to require the amount owed to be paid promptly. The employer can pay the amount owed immediately since section 8(e)

clearly sets forth the compensation an employer is obligated to pay. As such, it is unreasonable that an employee should have to wait for a judgment to be entered before receiving the compensation clearly owed." *Lester*, 256 Ill. App. 3d at 523, 628 N.E.2d at 193.

If an employer delays paying compensation, the employer bears the burden of showing that it had a reasonable belief that the delay was justified. *Lester*, 256 Ill. App. 3d at 524, 628 N.E.2d at 194. The Commission's determination on this issue will not be disturbed unless it is against the manifest weight of the evidence. *Howlett's Tree Service v. Industrial Comm'n*, 160 Ill. App. 3d 190, 197, 513 N.E.2d 82, 86 (1987).

■ In the instant case, the respondent contends that the claimant failed to notify it of his choice of remedies; that is, whether he would elect statutory compensation under section 8(e) of the Act or a wage-loss differential under section 8(d)(1) of the Act. Thus, respondent argues, it was reasonable for it to delay payment until the claimant's new counsel moved for an immediate hearing in 1992, some three years after the injury. We find this argument unpersuasive. As the claimant notes in his brief, the respondent is entitled to credit for any compensation already paid toward permanency at the time of arbitration. There is no reasonable argument that a claimant would choose a section 8(d)(1) wage-loss differential award if the amount he is likely to receive under that provision is *less* than his statutory entitlement under section 8(e). The respondent risks nothing when it begins payments for an undisputed section 8(e) injury, such as an amputation. Should the claimant later elect a wage-loss differential, the employer will still be entitled to credit for amounts paid, and additional amounts will necessarily remain to be paid. The Commission's decision to award penalties under section 19(k) of the Act and attorney fees under section 16a(B) of the Act was not against the manifest weight of the evidence.

■ The claimant argues that the Commission incorrectly calculated the amount of fees due under section 16 of the Act, basing its fee calculation on a figure representing 20% of the amount of penalties due rather than on 20% of the total amount of compensation unreasonably withheld up to the time of arbitration. This contention is not properly before this court because the claimant failed to bring it on cross-appeal, and the respondent does not contest the amount of fees awarded, but only the applicability of the provisions allowing for the award of penalties and fees.

■ Finally, we turn to the respondent's contention that the Commission's determination that the claimant's left carpal tunnel

syndrome is causally related to the December 1988 accident is against the manifest weight of the evidence. The determination of causation is a question of fact to be resolved by the Commission. *Illinois Mutual Insurance Co. v. Industrial Comm'n*, 201 Ill. App. 3d 1018, 1038, 559 N.E.2d 1019, 1033 (1990). In resolving questions of fact, it is the province of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign the weight to be accorded the evidence and draw reasonable inferences from the evidence. *Kirkwood v. Industrial Comm'n*, 84 Ill. 2d 14, 20, 416 N.E.2d 1078, 1080 (1981).

We note that claimant's treating physician gave an opinion that the claimant's carpal tunnel syndrome was primarily caused by the overuse of his left hand following the loss of his dominant right hand. The loss of the right hand was a precipitating factor in the claimant's development of left carpal tunnel syndrome. Thus, if not for the amputation, the claimant would not have developed carpal tunnel syndrome in his left upper extremity. While this condition was undoubtedly accelerated by the claimant's attempt to return to work from June through August 1989, Matteliano's opinion suggested that the syndrome would likely have developed anyway, simply by virtue of the claimant's constant use of a hand that was little used during most of his life when he had a dominant right hand. The Commission could reasonably find that the amputation was a causative factor in the claimant's development of left carpal tunnel syndrome. The Commission's decision to award benefits for partial loss of use of the left hand and left middle finger was not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Cook County confirming the Commission's decision is affirmed in part and reversed in part. The Commission decision is confirmed as modified by this decision.

Affirmed in part and reversed in part; Commission's decision confirmed as modified.

RAKOWSKI and HOLDRIDGE, JJ., concur.

JUSTICE COLWELL, dissenting in part:

I respectfully dissent in part because I believe the majority misconstrues the legislature's intent with regard to the Commission's authority to award compensation at a higher rate for a statutory amputation. I believe the Commission correctly found that it was within its authority to award the claimant PPD compensation at the rate of $66^2/3\%$ of his average weekly wage, rather than the 60% rate espoused by the majority.

Construing sections 8(b)(2.1) and (b)(4) in accordance with paragraph (e), as the Commission did, I would find that section 8(b)(4), by its express terms, applies to amputations. Section 8(b)(2.1) applies to all other awards under paragraph (e) other than amputations and enuncleations. All of the remaining paragraphs to which section 8(b)(4) applies relate to death, permanent *total* disability and temporary total disability. Put another way, the *only* PPD claims covered by section 8(b)(4) are amputations and enuncleations. 820 ILCS 305/8(b)(4) (West 1992). Thus, my review of the provisions of the sections in question reveals that the Commission was correct in its reading of the statute.

Further, the paragraphs and subparagraphs to which section 8(b)(2) apply are much broader than the portions to which section 8(b)(4) applies. As noted, section 8(b)(4) limits the increase in maximum weekly compensation to only instances of death, permanent or temporary total incapacity, amputation of a member and enucleation of an eye. 820 ILCS 305/8(b)(4) (West 1992). It does not apply to "all cases of serious and permanent disfigurement" and of "permanent partial disability" as does section 8(b)(2.1). 820 ILCS 305/8(b)(2.1) (West 1992). Thus, construing the statute as a whole and for its practical and liberal interpretation (see *Vaught*, 52 Ill. 2d at 165), I believe that the legislature clearly intended that only the most serious cases be afforded a higher maximum level of compensation. This does not negate the meaning of section 8(b)(2.1), because that section still applies to all other cases of serious and permanent disfigurement and permanent partial disability *except* cases of death, total incapacity, amputation or enucleation. Paragraph (e) allows PPD awards for loss of use other than amputations and enucleations, and those awards are still subject to the 60% limitation. Thus, I believe the Commission did not err in awarding the claimant benefits at the rate of 66²/₃% for his amputation. Thus, I dissent as to that portion of the majority's opinion and concur in the remainder of the disposition.

RARICK, J., joins this dissent.